The second case of the day, BRC Rubber v. Continental Carbon. Mr. Ryan. Good morning. Please, the Court, I hope to discuss this morning the two errors made by the Court below. First, when it construed the agreement at issue as a requirements contract, and second, when it found as a matter of law that Continental repudiated that agreement. I also hope to discuss BRC's cross-appeal of the lower court's order striking the testimony of BRC's undisclosed and unqualified expert witness on the subject of its future damages. The agreement at issue was not a requirements contract. BRC contended that the agreement was an unlimited requirements contract under UCC 2306 that obligated Continental to supply all of BRC's requirements for five years for carbon black. Continental contends that the agreement was not a requirements contract. Its express terms only obligated Continental to sell approximately 1.8 million pounds per year of carbon black to BRC at the prices specified in the agreement. A requirements contract must obligate the buyer, first, to buy goods, two, to buy all of its requirements for those goods from the seller, and for the buyer to buy the goods exclusively from the seller. Without those things, it cannot be a requirements contract. And none of those required elements were expressed in the agreement. The Court found that they were implied. The agreement had no express term that said BRC had to buy anything, and it didn't say that it had to buy its requirements from Continental, and it did not expressly obligate BRC to buy exclusively. The Court found that one clause essentially implied all of those elements, and that was the meet and release clause. The meet and release clause stated that if BRC found a better offer or an offer it believed to be better, that Continental had the right to meet the terms of that or release BRC from any further obligation. And BRC's ability to choose another supplier negates the implication of exclusivity. That's what most other cases have found. The Court below relied on a case, Structural Polymer Group v. Zoltech, and that case is distinguishable because in that case, the issue was not whether the parties intended for it to be a requirements contract. Those things were stated in that contract. Structural Polymer Group and Zoltech did not dispute that it said, the contract said that SP would buy all of its requirements from Zoltech. Zoltech was challenging in the trial court whether there was any mutuality of obligation because there was a price protection provision in that contract, and the Court below in that case ruled that the price protection provision, because it was an option, was enough to give consideration and mutuality of obligation. But in other cases where it's not clear that it was a requirements contract that was intended, the ability of the buyer to choose another supplier at any time eliminates the implication of exclusivity. Everything that was required for a requirements contract here was being implied by this one clause as opposed to other contracts where it's clear a requirements contract was intended. So it's too much to put on this one clause in the contract that otherwise does not speak about having exclusive obligations or buying all of its requirements. The Court also relied on course of performance and course of dealing to supplement the meaning of the contract, that there's an important distinction that needs to be made because a lot of the evidence that was put forward by BRC could not be considered course of performance or course of dealing. It was testimony of parties about what they thought the agreement meant when they wrote it, not what the parties actually did, their conduct. And in fact, in this case, the course of dealing, which was prior to the supply agreement, did not support a finding that this was intended to be a requirements contract. It is true that Continental supplied BRC with carbon black for several years, but it was under no contract at all. BRC was part of a consortium that purchased carbon black that Continental had a pricing agreement with that it renewed every year and would set the price for the year. There was no obligation for BRC to buy anything. Continental supplied it with carbon black, but it could have gone with anyone at any time. What it did when it wanted carbon black was it would send an order to Continental. Continental would see if it could meet the terms of the order as far as the time and the grade when it wanted to be shipped, and if it could, it would confirm the order, and it would confirm it at the prices for that year's pricing agreement. This supply agreement was intended to extend something like that after that consortium went away so that they could have prices set for five years. And if you read the contract in that context, it makes sense. It doesn't make as much sense as a requirements contract because it doesn't talk about any of the things you would expect to find in a requirements contract. And because the agreement was not a requirements contract, the court should have found that BRC's claim for anticipatory repudiation failed as a matter of law. Mr. Ryan, what about the language, the release language, release BRC from any further obligations? And that is the only place in the contract. How do you read that? I read that as the obligation it's referring to. There's a five-year agreement for pricing. BRC, which this contract was jointly drafted, it's clear that BRC was avoiding putting any specific obligation on itself, but this looks like a way of making sure that if there is an obligation construed that it can get out of it when it wants to. Now, there's five years at those prices. If the market suddenly changed and BRC no longer wanted to have a pricing agreement that lasted that long because it could get another agreement elsewhere and did not want to have a claim that it had somehow breached this pricing agreement, it could make sure it was out of it. I don't think it implies that it was going to buy exclusively and that it was going to be for all of its requirements, which are the critical key elements that are missing. Turning to the second summary judgment granted by the court, the court erred by granting summary judgment on repudiation. It held as a matter of law that Continental repudiated the agreement by failing to provide adequate assurances to BRC. This was an error because the court did not apply the strict legal standard required to find anticipatory repudiation, and it granted summary judgment despite the presence of disputed issues of material fact. Repudiation of a contract must be absolute, positive, and unconditional in order that it be treated as an anticipatory breach. And because that doctrine of anticipatory repudiation represents such a harsh room here, BRC was seeking more than $2 million in damages for the remainder of the contract term, which was at that point around three-and-a-half years left on the contract. The requirement that the repudiating statement be clear and positive and absolute is strict. There are no facts in this case that indicate any such clear, positive repudiation of the contract. In fact, you have evidence that Continental repeatedly affirmed that it was going to honor the agreement, continue to supply BRC, and not cut off supply. Now, in summary judgment, the court was required to view the facts in the light most favorable to Continental  and if it had done that, it would have had to deny that motion for summary judgment. There was no statement in this case that Continental said it will not perform. It repeatedly said we will continue to supply you. But in order to find that Continental repudiated the agreement as a matter of law, the court below disregarded the testimony of Continental's witness, Tom Mosia, and also found that his testimony on certain issues was not credible. It made credibility determinations on summary judgments, which it should not have done. The evidence the court found to be proof of positive, absolute, unconditional repudiation consisted of statements made in e-mails in the critical period before BRC terminated the contract, from which the court drew inferences against Continental, despite the fact that Mr. Mosia, in his sworn testimony, explained those statements and explained what he meant by those statements. And those inferences should have been drawn in favor of Continental. Mr. Mosia, in those e-mails, repeatedly referenced the express language of the agreement, which said that it is the intent of the agreement for Continental to sell approximately 1.8 million pounds. And the court inferred that Mr. Mosia was saying that Continental would supply only 1.8 million pounds, which he never said and which he denied in his sworn declaration that he meant that to be interpreted that way. He was affirming the intent of the contract as it was expressed in the contract. The court below said that the statements in his declaration were, quote, directly belied, end quote, by those e-mails and decided it was not credible and it should be disregarded in favor of the court's interpretation and inferences regarding those e-mails. That should not have happened on summary judgment. Continental deserved a trial for a finder of fact to determine who was telling the truth or whether that was credible or not. Mr. Mosia always expressed Continental's intention to perform, and his statements that were before the court did not indicate any absolute, positive, unconditional repudiation of the agreement. So the district courts failed to apply the correct legal standard for finding the anticipatory repudiation and failed to recognize the disputed fact issues presented should have precluded granting summary judgment to BRC. Continental should get a new trial on that. Turning to the cross appeal, BRC has appealed the court's exclusion of BRC's undisclosed expert witness on the issue of its future damages. BRC failed to disclose its witness, who was an employee of BRC, Mr. Cornwell, failed to disclose him as an expert as required by Rule 26 and the court's scheduling order. Well, BRC knew Cornwell was going to testify as to damages, right? Continental knew that Mr. Cornwell was a fact witness because he had been disclosed as a fact witness, and at Mr. Cornwell's deposition, it was discovered this was his fact deposition, which was the only one that Continental took. It was discovered at that deposition that he had prepared the spreadsheet that BRC relied on to show its damages, and that was the first time that had been disclosed. The deadline to designate or disclose. And he was questioned about that during the decision, right? But it was not as an expert, and in fact, Continental fully expected that at some point there would be an expert designated. BRC had designated another expert, and there was an expert deposition taken of that expert, and all of the disclosures and reports were produced as required for that expert, but none of that ever happened for Mr. Cornwell. Now, Continental was in the position of only rebutting what BRC wanted to put up as its damages, but if there's no expert on future damages, and BRC believes that it can produce opinions on future damages as evidence, without an expert, Continental is not in a position to rebut something that's not been designated. And also, Continental was not allowed to take another expert deposition of Mr. Cornwell if, once he had been designated as an expert, which didn't happen, and he also didn't produce a report. Continental also did not get all of the materials he used to come up with his opinions until just a few weeks before trial. And whether this was a mistake on BRC's part or a strategy, it doesn't really matter. The rule was intended to protect the opposing litigants, not to play a guessing game about what the other side is going to present as far as expert opinion evidence. And Continental probably would have retained its own expert to rebut Mr. Cornwell had it had that opportunity. So, and the second part of that is that it would have also had an opportunity to challenge Mr. Cornwell's opinions under Daubert. But since he was never designated as an expert, there was no opportunity to file anything about what his opinions were because they weren't disclosed other than what's on this spreadsheet and what Continental was able to find out in his fact deposition. But his opinions were based on a flawed and unreliable methodology and consisted mostly of his speculation and conjecture. And so even if he had been properly designated, Continental is confident that it would have been able to challenge him successfully under Daubert. Because his opinions did not satisfy the standard established under Daubert for expert opinion. And they were thus inadmissible under Rule 702. If there are no other questions, I'll reserve the balance of my time. All right. Thank you, Mr. Ryan. Ms. Moses? Good morning. May I please support? Your Honors, initially, Continental's view of what constitutes a requirements contract and what the court below did to determine whether or not the supply agreement was a requirements contract is really unnecessarily and impermissibly narrow in its argument here. Continental would have the court rely solely on the notion that there was a meet and release provision, the right of first refusal as I like to think of it, that if a better opportunity came along to BRC, BRC could present a written offer to Continental. Continental then had the option of whether or not to release BRC from the contract. Continental relies on that sole provision as the basis for the trial court's opinion as to the requirements contract or the nature of the requirements contract. That is not correct. The trial court considered more than that provision. The trial court also considered the quantities and the rebate provision. And those provisions have a significant impact on whether or not the supply agreement was in fact a requirements contract. But what language in the contract can you point to to suggest that BRC was required to buy all of its carbon black from Continental? Because there's certainly no express provisions. It is not express. Prohibitions in the contract saying that they can't go elsewhere, that they are prohibited from going elsewhere in the market to purchase. I would disagree with that, Your Honor. I believe that the meet or release provision is a requirement that BRC purchase exclusively from Continental. And I believe the contract has to be read as a whole. And there are three provisions that answer that question. The first is a meet or release provision which says that Continental has the right to meet the better offer or release BRC from any further obligation. If there was not a requirement for BRC to purchase, there would be no further obligation. The second provision is the quantity of materials provision, the one right below it in the supply agreement. It states that volumes are to be taken by BRC and that BRC is required to provide Continental with estimates of its future use in a timely manner in order to assist Continental in meeting these and additional requirements. The understanding there being that there wouldn't be any additional requirement if it wouldn't be all that BRC needed. But finally, there is the rebate provision. And I believe Continental asserts that that should be read independently which would, of course, violate our rules of interpreting a contract or applying us to review the contract as a whole. But it's the language itself that demonstrates that there was an understanding that BRC's annual volume would be taken from Continental. After the rebate provision itself that awards a penalty or a benefit based on the amount that's purchased, it states, should the normal annual volume for BRC shift significantly, BRC and Continental Carbon agree to establish new upper and lower limits. If there was no agreement between the parties that Continental would supply the annual volume for BRC, there would be no need for those words to be in the contract. And I believe, as the trial court stated, that when you read the agreement as a whole and you take all these provisions into consideration, it is indeed a requirements contract. In addition, Your Honor, there was some discussion as to the course of performance and course of dealing. It is Continental's position that the prior relationship of the parties, the course of dealing, does not demonstrate the exclusive nature of this contract. And BRC believes just the opposite is true. The relationship between the parties was in excess of 12 years. A testimony of the two people who were available, Mr. Nunley and Mr. Cornwell, stated that for at least a 12-year period, BRC had purchased all of the carbon black it needed from Continental and Continental had supplied all of the carbon black that BRC needed to BRC. The purpose of that discussion is to demonstrate that the course of dealing between the parties is, in fact, one of an exclusive nature. That was the case for the course of dealing prior to the contract and the course of performance during the contract. And it needs to be remembered that it was Continental that went to BRC and asked BRC to enter into this five-year supply agreement. As to Continental's argument regarding repudiation, that can't be looked at in a vacuum either. Continental would like to take a look solely at one statement in an affidavit by Mr. Mosia without taking into consideration the entire factual story that occurred up to that point. BRC asked for assurances, placed an order for delivery of three separate rail cars of carbon black. The first shipment was missed. BRC asked for adequate assurance that its contract would be complied with by Continental. If BRC, I think we made pretty clear in our briefs, if BRC is out of carbon black, BRC is out of business. And because BRC is a tier one supplier to the automotive industry, it impacts General Motors and Ford and Chrysler and the other companies to whom it supplies product. And so BRC asked for adequate assurance, and after some tussling, it got back a one-word email from Continental's in-house counsel that said simply confirmed. However, that same day, when BRC's employees contacted Continental to actually get the dates of delivery of shipment for the shipments that issue, they couldn't get any information. And this is after one of the Continental's employees initially sent an email saying, sure, sure, sure, we'll supply those three rail cars on this specific day, but at this higher price. When BRC complained about the higher price, Continental responded, no, no, that was our error. We're going to honor our original contract price, but now we don't know when we can ship this product to you. And so from that point forward, BRC's employee was fairly consistent and constant in its request of Continental to identify the dates that the carbon black would be shipped, and got nothing until it got its response from Mr. Mosia, who said, we intend to ship you 1.8 million pounds of carbon black. Now, it is absolutely accurate that Mr. Mosia did not use the word only in his emails, but I believe it is page 31 of our last brief, Your Honors, in which we identify each one of the emails from Mr. Mosia, in which he said, that is what I said, we intend to ship you 1.8 million pounds. We'll tell you what we can do next week. We'll get you a shipment as soon as we can. We're doing the best we can. We're not going to short other customers. There was absolutely no question in anyone's mind at that point in time that Continental was going to ship no more than 1.8 million pounds, the approximate estimate as identified in the requirements contract. Included in Mr. Mosia's emails was also the statement that BRC was to purchase 150,000 pounds of carbon black per month and had been purchasing well in excess of that amount, the implication being that Continental would not breach its obligations to BRC, even if it supplied the remainder of the 1.8 million pounds sometime in December of that year and left BRC to flounder for the intervening period of time. As to Continental's assertions that the trial court made factual determinations or disregarded disputed issues of fact, a review of the citations that are contained in the record demonstrate that there really, truly were no disputed issues of any material fact. While Continental asserts to some degree that there are maybe a couple of minor facts that were in dispute, there are certainly no material facts that the court determined, and the court made no credibility determinations either. On the issue of repudiation, there seems to be some messiness in the record on the question of whether Continental provided adequate assurances to BRC, which summary judgment shouldn't be granted when there's no clear absolute statement of repudiation. And that is the issue that I was discussing, Your Honor. There are, it's on page 31 of our final brief, and I believe there are five or six emails from Mr. Mosiah in which he repeatedly states in response to requests from BRC, when is this product going to be shipped? I told you, we're going to ship 1.8 million pounds. It is absolutely clear that Continental has no intention to ship any more than 1.8 million pounds, and it is the failure to provide the adequate assurance in addition to the assertion that no more than 1.8 million pounds will be shipped that constitutes repudiation. If the court has no further questions, I'd like to move on to the issue presented by the cross-appeal. This is not, as it appears to be argued, a case in which BRC intentionally omitted any information from its opponent in order to gain an unfair advantage. The hallmark benchmark, the issue, is whether or not Continental has been harmed as a result of the failure to disclose. And as Judge Williams indicated previously, Mr. Cornwell was known to Continental as a fact witness in this case, but more importantly, Mr. Cornwell created the BRC damages chart. And that chart, which is designated as BRC 1 in the record, is the very first document that was produced to Continental during discovery. And that chart, though provided in September of 2012, does not just identify damages through September of 2012. It identifies BRC's actual damages to that point and its anticipated damages for the remainder of the five-year period of the supply agreement. So why didn't BRC declare Cornwell as an expert who would be testifying about the company's future damages? In retrospect, BRC should have done that, Your Honor. As the trial court made very clear, it found Mr. Cornwell to be an expert. It was BRC's opinion, understanding that Mr. Cornwell would testify as a lay opinion witness. That is how he was presented to the court. And that is the argument that ensued in the trial court as to his ability to testify in this matter. Mr. Cornwell was, in essence, testifying as to his job requirements while at BRC, which was to determine and to order product and determine the cost of BRC. And it was his understanding that he could testify to that as a lay opinion witness. Mr. Cornwell provided not only the actual damages and future damages, but also in his damages chart the assumptions on which his calculations were based, so that when Mr. Cornwell was deposed three months later in December of 2012, Continental had all of the information it needed in order to understand the damages. And Continental was free and did question Mr. Cornwell as to all of the assumptions, including his use of the EIA, the energy information from the Department of Energy, as to the cost of oil and gas in the product going forward. Mr. Cornwell's assumptions as to the additional volume needed of carbon black in the future for the remainder of the period was also included in that chart. All of that information was provided to Continental. And five days after Mr. Cornwell was deposed as a fact witness, Continental submitted supplemental 26A disclosures in which they identified their vice president and chief financial officer, Tom Carroll, as a witness to testify. And Mr. Carroll was identified as testifying as what can only be considered a rebuttal witness for Mr. Cornwell. He was identified as testifying to damages and the basis for the damages claimed by BRC. And that is exactly what Mr. Carroll did. One of the issues that the trial court found and the reasons that it determined to strike Mr. Cornwell's testimony was the fact that, or the assertion that, Continental was unable to obtain a rebuttal witness. In reality, and in fact, Mr. Carroll was an actual rebuttal witness. Mr. Carroll took the damages chart prepared by BRC, reconfigured the information relied upon and the information used by Mr. Cornwell, made his own exhibits and made his own damages chart, and then testified based on industry publications that he believed BRC's request for damages was unreasonable. He was, in actuality and in fact, a rebuttal witness. As a result, Continental was given all of the information that it would be given had Mr. Cornwell been disclosed as a witness. There was no hiding. There was no surprise. And there was certainly no prejudice. The other factors that are considered or that have been considered by this court as stated in Tribble are whether the trial was disrupted in any way and that did not occur in this case. Mr. Cornwell testified and the parties proceeded through trial. Mr. Cornwell's testimony was stricken after trial. And whether there was bad faith on BRC. And I would submit, Your Honor, that there is absolutely nothing in the record to indicate any bad faith on BRC's part. Rather, as stated, BRC believed Mr. Cornwell to be able to testify as a lay witness. And what's really important at this point, in this posture of the case, is that Mr. Cornwell was testifying on two separate issues. He testified as to the volume of carbon black that BRC believed it would need and he testified as to the price of that carbon black. The volume issue is no longer necessary. It no longer needs to be before the court because the trial court, in its final order, made a determination that under the terms of the supply agreement, BRC could only demand and Continental could only be required to supply up to 2.9 million pounds. So regardless of the fact that Mr. Cornwell testified that BRC would need 4 million pounds, that is no longer relevant and that testimony is no longer needed in order to determine BRC's damages. The second issue, that of pricing, is simply math. Mr. Cornwell took the formulas that are found in the Continental contract, the supply agreement, and the cover contract with Sid Richardson. He inserted the value of oil and gas as determined by the Department of Energy and he just did multiplication and calculated the amount of the damages. That is not expert testimony. And so with the trial court's determination that the maximum volume is 2.9, the issue of whether or not there could possibly be any harm to Continental as a result of Mr. Cornwell's testimony has essentially been resolved. Are there no further questions? Thank you, Your Honor. Thank you, Ms. Moses. Mr. Ryan? I'd like to try to clear up some of the confusion on the record, as the Court suggested about the time leading up to the request for assurances, to briefly summarize what was happening. Continental was having a lot of trouble because all of its margins were too low. So back in the beginning of 2011, it asked for price increases from all of its customers, including VRC. VRC didn't agree to a price increase. This was in April 2011. But this did have the effect of souring relations between Continental and VRC because Continental had asked for a two-cent price increase. Around the same time, because Continental was trying to cut costs, it started firing some of its employees, including the salesman that had worked with VRC for a long time. Around this time, this is in the record from his testimony, he was let go. And before he was let go, he made some calls to VRC to suggest that Continental was not going to honor its contract. And this got VRC believing that Continental was going to breach its agreement. Mr. Mosia has addressed all of that in his testimony and said none of that former employee testified to happened. But leading up to this, there was an order put in by VRC in April, end of April, for approximately 320,000 pounds or so to be delivered in May. Later, one of those shipments was clarified to be a June shipment. Continental didn't confirm that order. It was having trouble with one of its plants as well as trying to figure out how it was going to meet all the supply because the market was very tight. The rebound of the economy and the industry that Continental supplied was very sharp and it was having trouble meeting the demand. It also had one of its plants out of commission for most of the month of May. Around May 16th, VRC's lawyer sent a letter to Continental, to Mr. Mosia, demanding adequate assurances. That's about the point that Continental's in-house counsel became aware of what was going on. And by May 20th, Continental's in-house counsel had replied directly to an email from VRC's outside counsel that it sent the request for adequate assurances. And the email from VRC's lawyer said, confirm that Continental Carbon will continue producing and shipping timely contract prices and will not cut off supply to VRC. Continental's lawyer replied, confirmed. That's the one word, adequate assurance. It is completely unequivocal, giving exactly the assurance that VRC asked for. After that, Continental continued to say that it would perform as required by the agreement and that's what the emails that had been construed in a way other than what Mr. Mosia intended when they were sent to say that he's trying to say we're only going to supply 1.8. He kept repeating the language of the agreement and was trying not to expand the agreement beyond whatever it meant by repeating that. So to have that deemed an absolute positive unequivocal repudiation just can't be done because he was expressing intent to perform while he's saying what the agreement actually says and that can't be a repudiation. Now, turning to the... Well, he was... Yeah. He was mentioning the 1.8, was he not? That's because the agreement, the actual language of the agreement is it is the intent of this agreement that Continental Carbon Company agrees to sell to VRC Rubber and Plastics approximately 1.8 million pounds of prime firm's plaque annually. And so he kept repeating that language or paraphrasing that language when he was saying we're going to perform, we're going to perform an agreement. And it was to be consistent with the general counsel's email to VRC's counsel that we're not going to cut off supply, we're going to continue to perform. Well, the performance in 2010, 2011 was in the 2.6, 2.7 million range, right? Right. The years leading up to the supply agreement, this was evidence that was before the court on summary judgment that VRC ordered somewhere usually in the range of 2 million pounds, between 1.5 to 2 million pounds, setting the pricing agreement that Continental would sell 1.8 the year before VRC had purchased 1.9. And it was never, talking about the rebate provision, VRC had never, it was never the intent of either, there's no testimony about anything contrary to this, that the rebate was always meant to be achieved. So there's language in the contract about shifts in the amount VRC was ordering. Then they would have to adjust that because... Well, and if you ship less than 2.1, you don't get the discount, right? That's correct. And if VRC didn't order at least 1.5, it would have to pay an additional half a cent. And if it's lower than 1.4, another half a cent. This was all consistent with a pricing agreement the way it had done in the past. I see I'm out of time. Thank you, Your Honor. Thanks, Brian. Thanks to all counsel. The case is taken under advisement and the court will...